07-1986-cv
Dean v. Blumenthal

UNITED STATES COURT OF APPEALS
FOR THE SECOND CIRCUIT

––––––––––––––

August Term, 2008

(Argued: November 10, 2008                                    Decided: August 11, 2009)

Docket No. 07-1986-cv

––––––––––––––

MARTHA DEAN,

*Plaintiff-Appellant,*

ROBERT FARR,

*Plaintiff,*

—v.—

RICHARD BLUMENTHAL,

*Defendant-Appellee.*

––––––––––––––

B e f o r e : KATZMANN and HALL, *Circuit Judges.*[*]

––––––––––––––

Appeal from an April 9, 2007 judgment of the United States District Court for the District of Connecticut (Thompson, *J.*), dismissing a First Amendment challenge to a prohibition on contributions by, *inter alia*, certain law-firm employees to candidates for Connecticut Attorney General. We hold that all requested relief, other than damages, is moot and that appellee is entitled to qualified immunity from damages because there was no clearly established right under the First Amendment to receive campaign contributions at the time of the challenged conduct. Accordingly, we AFFIRM the judgment of the district court.

––––––––––––––––––––––––––––––

KAREN LEE TORRE, Law Offices of Karen Lee Torre, New Haven, CT, *for Appellant.*

GREGORY T. D'AURIA, Associate Attorney General

––––––––––––––

[*] The Honorable Sonia Sotomayor, originally a member of the panel, was elevated to the Supreme Court on August 8, 2009. The two remaining members of the panel, who are in agreement, have determined the matter. *See* 28 U.S.C. § 46(b); Local Rule 0.14(2); *United States v. Desimone*, 140 F.3d 457 (2d Cir. 1998).

(Richard Blumenthal, Attorney General, Susan Quinn Cobb, Assistant Attorney General, Jane R. Rosenberg, Assistant Attorney General, *on the brief* ), Office of the Attorney General for the State of Connecticut, Hartford, CT, *for Appellee*.

PER CURIAM:

Martha Dean appeals from an April 9, 2007 judgment of the United States District Court for the District of Connecticut (Thompson, *J.*), dismissing her complaint. Dean, a former and possibly future candidate for Attorney General in Connecticut, argues that a contractual prohibition on contributions to candidates for the Office of the Attorney General from, *inter alia*, certain employees of private law firms that performed legal work for the State violated Dean's rights under the First Amendment. Because the challenged contractual language has not been enforced in over six years and could not reasonably be expected to be reimplemented, we hold that Dean's requested relief of a declaratory judgment, injunctive relief, and a cease-and-desist order are moot. We also hold that appellee Richard Blumenthal is entitled to qualified immunity from Dean's claim for damages because there was no clearly established right under the First Amendment to receive campaign contributions during the relevant period. Accordingly, we affirm the judgment of the district court.

## BACKGROUND

Under Connecticut General Statute § 3-125, the Attorney General for the State of Connecticut ("Attorney General") "may procure such assistance as he [or she] may require" in carrying out his or her official responsibilities. Pursuant to this statute, the State of Connecticut, acting through its Attorney General, has contracted a portion of the State's legal business to the private bar.

2

From 1995 to October 2002, Attorney General Richard Blumenthal included and enforced the following provision in contracts with outside counsel:

> No partner, owner, director and/or employee, with managerial and/or discretionary authority, of the COUNSEL may directly or indirectly make financial donations to any candidate for the Office of the Attorney General of the State of Connecticut during the course of this agreement.

The Attorney General interpreted this language to apply to all lawyers in a contracting law firm as well as to spouses of covered lawyers. According to the Attorney General, this provision was included in order to avoid the appearance that the contracting law firm was being awarded a contract in exchange for future campaign contributions.

In 2002, this policy was challenged by appellant Martha Dean, who was the Republican Party's candidate in Connecticut for the Office of the Attorney General. Her opponent was appellee Blumenthal, who at that time had held the office for twelve years. Prior to election day, Dean filed a complaint in which she alleged that Blumenthal's policy on campaign donations deprived her of "needed financing for her campaign as a result of willing contributors withholding contributions for fear of suffering the loss of the State's business." (Compl. ¶ 19.) Pursuant to 42 U.S.C. § 1983, Dean asserted that Blumenthal's policy both violated her right under the First Amendment to receive campaign contributions and deprived her of her "right to receive funding for her campaign from otherwise willing supporters without due process of law" in violation of the Fourteenth Amendment. (Compl. ¶¶ 21–22, 26.) Dean also alleged violations of the Connecticut Constitution. She sought relief including damages, a judgment declaring the contractual bar on campaign contributions to be null and void, a cease-and-desist order, and a preliminary injunction enjoining the promulgation of the policy.

3

Approximately one week prior to the election, Blumenthal temporarily suspended the contractual prohibition on campaign contributions pending a final decision by the district court. A letter was faxed to all firms with contracts with the Office of the Attorney General notifying them of the suspension. Blumenthal, however, continued to refuse to accept any campaign contributions from partners and associates (as well as their spouses) of any law firm holding an outside counsel contract with the Attorney General's office. After winning re-election, Blumenthal moved to dismiss Dean's complaint.

Approximately four years passed between Blumenthal's motion to dismiss and the district court's eventual ruling. Because the lawsuit had not been resolved by the next election cycle in 2006, Blumenthal continued his suspension of the campaign contribution prohibition.[1] Once again, a letter was faxed to all firms with open contracts with the Office of the Attorney General notifying them of the policy's continued suspension. In addition, the Connecticut General Assembly passed campaign finance legislation in December 2005 that prohibited contributions from, *inter alia*, state contractors and prospective state contractors to certain committees affiliated with a candidate for the Office of Attorney General. *See* S. 2103, 2005 Gen. Assem., Spec. Sess. (Conn. 2005). As a result of this legislation, Blumenthal publicized to all firms with contracts with the Office of the Attorney General that the contractual bar on campaign contributions would be "wholly and permanently superseded" by the statutory ban as of December 31, 2006, the effective date of the campaign finance legislation.

_____

[1] Although Dean did not run for Attorney General in 2006, she pursued her claims on the ground that she was considering a campaign in the following election cycle and, regardless of her political intentions, was entitled to damages as well as attorney's fees. Robert Farr, the Republican Party's nominee for the Office of Attorney General in 2006, was added as a party to Dean's complaint. Farr subsequently filed a notice of voluntary dismissal, which was approved by the district court. Thus, he is not a party to this appeal.

In September 2006, the district court granted Blumenthal's motion to dismiss. The court held that Dean's claim under the Fourteenth Amendment failed because she could not demonstrate a liberty or property interest in the receipt of campaign contributions. It also dismissed Dean's state law claims as barred by the Eleventh Amendment.[2] During the following week, the district court dismissed Dean's remaining claim, which was based on the First Amendment. The district court concluded that Dean lacked standing because there existed no constitutional right to receive campaign contributions.

## DISCUSSION

As a preliminary matter, we address our subject-matter jurisdiction over this appeal, which we have an independent obligation to evaluate even in the absence of a challenge from any party. *Sharkey v. Quarantillo*, 541 F.3d 75, 88 (2d Cir. 2008). We lack jurisdiction if we conclude that a case is moot. *Fox v. Bd. of Trs. of the State Univ. of N.Y.*, 42 F.3d 135, 140 (2d Cir. 1994); *see also Steffel v. Thompson*, 415 U.S. 452, 459 n.10 (1974) ("The rule in federal cases is that an actual controversy must be extant at all stages of review, not merely at the time the complaint is filed."). "A case might become moot if subsequent events made it absolutely clear that the allegedly wrongful behavior could not reasonably be expected to recur." *Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc.*, 528 U.S. 167, 189 (2000) (internal quotation

---

[2] Dean states in her brief that she does not appeal the dismissal of her state-law claims, but she then argues that Blumenthal violated the separation of powers "set forth in the Constitution of the State of Connecticut." In addition, Dean states in a section of her brief entitled "Summary of the Argument" that her federal right to due process was violated because "the restrictions established the defendant as the sole arbiter of when the restrictions had been violated with no meaningful review of his decisions." But she has failed to develop either her state separation-of-powers or federal due process arguments and has therefore waived them. *See Norton v. Sam's Club*, 145 F.3d 114, 117 (2d Cir. 1998) ("Issues not sufficiently argued in the briefs are considered waived and normally will not be addressed on appeal.").

marks omitted); *see Church of Scientology of Cal. v. United States*, 506 U.S. 9, 12 (1992) ("It has long been settled that a federal court has no authority to give opinions upon moot questions or abstract propositions, or to declare principles or rules of law which cannot affect the matter in issue in the case before it." (internal quotation marks omitted)).

We conclude that much of Dean's appeal is moot and therefore beyond our jurisdiction to review. Dean's complaint principally seeks a declaratory judgment, injunctive relief, and a cease-and-desist order regarding an "office policy" that (it is undisputed) no longer exists. (Compl. at 12.) Dean attempts to avoid this complication by contending that Blumenthal could re-enact the policy at any moment, which might affect her if she runs in the next election and which, in any event, may amount to unconstitutional conduct that is capable of repetition yet evades review. *See Altman v. Bedford Cent. Sch. Dist.*, 245 F.3d 49, 71 (2d Cir. 2001) ("A narrow exception to the principle that a moot claim is to be dismissed, available only in exceptional situations, is that the court may adjudicate a claim that, though technically moot, is capable of repetition, yet evading review." (citations and internal quotation marks omitted)).

It is clear, however, that the Attorney General will not re-enact the contractual bar on campaign contributions. The Attorney General has represented to the Court that he "has no intent to reintroduce the challenged provision into his contracts." Standing alone, this representation might not suffice to render moot Dean's requested relief. *See United States v. W. T. Grant Co.*, 345 U.S. 629, 633 (1953) (holding that, although defendant had "disclaimed any intention" to revive the challenged conduct, "[s]uch a profession does not suffice to make a case moot although it is one of the factors to be considered in determining the appropriateness of granting an injunction against the now-discontinued acts"); *see also Friends of the Earth, Inc.*, 528 U.S. at 189 (describing the "heavy burden of persuading the court that the challenged

6

conduct cannot reasonably be expected to start up again" (internal quotation marks and brackets omitted)). But the Attorney General's claim is bolstered by his voluntary practice of not enforcing the contractual prohibition over the past six years and of deleting the contractual prohibition over two years ago.

Moreover, although "[v]oluntary cessation of illegal conduct does not necessarily render the controversy moot," *N.Y. State Nat'l Org. for Women v. Terry*, 159 F.3d 86, 91–92 (2d Cir. 1998), the Attorney General has further represented that Connecticut's campaign finance legislation, Conn. Gen. Stat. § 9-612(g)(2)(A), "wholly and permanently superseded" the contractual bar, thus rendering it "superfluous." It is true, as Dean asserts, that the statutory and contractual language do not cover identical conduct. For example, the Office of the Attorney General acknowledged that the contractual provision applied to contracts in all amounts, while § 9-612(g)(2)(A) applies only to contracts in excess of $50,000. *See* Conn. Gen. Stat. § 9-612(g)(1)(C). Nonetheless, it is undisputed that, in reliance upon his interpretation that the statutory and contractual language cover sufficiently similar situations, the Attorney General voluntarily eliminated the contractual bar upon the statute's effective date over two years ago. The Attorney General also has not reimplemented his practice despite a favorable ruling from the district court in April 2007 that Dean lacked standing to challenge the contractual prohibition. Consequently, there is no "reasonably concrete basis to anticipate that the expired rule will be reenacted in a form that will raise the same questions." 13C Charles Alan Wright & Arthur R. Miller, *Federal Practice and Procedure* § 3533.6 (3d ed. 2008).

In light of (1) the undisputed fact that the contractual bar is no longer in effect, (2) the Attorney General's consistent and voluntary conduct over an extended period of time in not enforcing the contractual ban, (3) his removal of the challenged contractual language based upon

7

his belief that legislation has "wholly and permanently" rendered the challenged practice unnecessary, (4) his representations that he has no intention to re-implement the practice, and (5) his declining to reimplement the challenged practice despite a favorable ruling from the district court dismissing Dean's complaint, we conclude that Dean's requested relief for a declaratory judgment, injunctive relief, and a cease-and-desist order are moot. *See Catanzano v. Wing*, 277 F.3d 99, 107 (2d Cir. 2001) ("Since both Plaintiffs and Defendants agree that the State is no longer implementing the fiscal assessment laws, and there is no reason to expect that fiscal assessments are now occurring or that the legislature will reenact the laws, no controversy now exists with respect to this claim and it is therefore moot.").

Dean's complaint, however, also seeks damages, and Blumenthal's withdrawal of the challenged policy does not render moot Dean's requested relief for past constitutional violations. *See Stokes v. Vill. of Wurtsboro*, 818 F.2d 4, 6 (2d Cir. 1987) ("'Claims for damages or other monetary relief automatically avoid mootness, so long as the claim remains viable.'" (quoting 13A Charles Alan Wright, Arthur R. Miller, & Edward Cooper, *Federal Practice and Procedure* § 3533.3 (2d ed. 1984))); *see also Beyah v. Coughlin*, 789 F.2d 986, 988–89 (2d Cir. 1986) (holding that an allegedly unconstitutional practice, which no longer affects plaintiff, "may well moot [plaintiff's] claims for declaratory and injunctive relief" but does not moot the request for damages). Even if Dean's actual damages are speculative, "[i]t is clear that nominal damages are available in actions alleging violations of constitutionally protected rights."[3] *Fox*, 42 F.3d at 141.

---

[3] Although Dean's complaint seeks only "damages," this term can include nominal damages. *See, e.g.*, *Irish Lesbian & Gay Org. v. Giuliani*, 143 F.3d 638, 651 (2d Cir. 1998) ("[W]e have not precluded the award of nominal damages in the past if the complaint explicitly sought compensatory damages."); *Beyah*, 789 F.2d at 989 (holding that plaintiff's potential entitlement to nominal damages prevented his claim from being moot, even where defendant contended that plaintiff would not be able to establish requested compensatory and punitive

Because Dean's claims are not moot insofar as she seeks damages, we now consider Dean's claim that the Attorney General's policy violated her purported First Amendment right to receive campaign contributions. Blumenthal disputed the existence of any such right, and the district court agreed. Although we affirm the district court's judgment, we do not adopt its reasoning.[4] *See In re Certain Underwriter*, 294 F.3d 297, 302 (2d Cir. 2002) ("[W]e are . . . free to affirm an appealed decision on any ground which finds support in the record." (internal quotation marks omitted)). Instead, we conclude that, regardless of whether a right to receive campaign contributions exists, it was not clearly established at the time of Blumenthal's alleged misconduct, and Blumenthal is therefore entitled to qualified immunity.[5] *See Pearson v. Callahan*, 129 S. Ct. 808, 815 (2009) ("The doctrine of qualified immunity protects government

damages).

[4] The district court dismissed Dean's claim under the First Amendment for lack of standing because it concluded that there was no constitutional right to receive campaign contributions. To establish Article III standing, a plaintiff must allege that she has suffered an injury-in-fact that is traceable to the challenged action of the defendant, and that is likely to be redressed by the requested relief. *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992). The injury-in-fact must be an invasion of a judicially cognizable interest that is (a) concrete and particularized and (b) actual or imminent. *Id*. It is true that "[t]he question whether there is an injury quickly becomes blended with the question whether to recognize the asserted interest that has in fact been impaired." 13A Charles Alan Wright & Arthur R. Miller, *Federal Practice and Procedure* § 3531.4 (3d ed. 2008). The district court, however, erroneously conflated the requirement for an injury-in-fact with the constitutional validity of Dean's claim. Dean has asserted that, as a result of the challenged contractual ban, she suffered the loss of a substantial base of financing for her campaign and cites, as an example, a request for a contribution refund from a supporter. Dean has therefore alleged a concrete, particularized, and actual harm that is sufficient to establish Article III standing.

[5] Dean never explained whether her complaint was brought against Blumenthal in his official or individual capacity. We therefore examined the "course of proceedings to determine the nature of the liability to be imposed," *Frank v. Relin*, 1 F.3d 1317, 1326 (2d Cir. 1993) (internal quotation marks omitted), and have construed Dean's claims to be brought against Blumenthal in his individual capacity, thus making him eligible to raise a qualified immunity defense. *See Ying Jing Gan v. City of New York*, 996 F.2d 522, 529 (2d Cir. 1993).

officials 'from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982))).[6]

Before discussing whether the right at issue was clearly established, however, we first explain how we approach our analysis of qualified immunity in light of the Supreme Court's recent re-examination of its holding in *Saucier v. Katz*, 533 U.S. 194 (2001), which had mandated a two-step sequence for resolving government officials' claims of qualified immunity. In the first step under *Saucier*, courts had asked the following question: "Taken in the light most favorable to the party asserting the injury, do the facts alleged show the officer's conduct violated a constitutional right?" *Id.* at 201. If a violation of a constitutional right was discerned, then the second question required by *Saucier* was "whether the right was clearly established." *Id.*

In *Pearson v. Callahan*, the Supreme Court recognized that *Saucier*'s protocol "is often beneficial," such as where the analysis of the facts under clearly established law "make[s] it apparent that . . . the relevant facts do not make out a constitutional violation at all" and where the question presented does "not frequently arise in cases in which a qualified immunity defense is unavailable." 129 S. Ct. at 818. But the Court rejected *Saucier*'s obligatory, two-step rule for

_____

[6] We consider whether Blumenthal is entitled to qualified immunity even though this argument is put forward for the first time on appeal. Although "it is a well-established general rule that an appellate court will not consider an issue raised for the first time on appeal," *Greene v. United States*, 13 F.3d 577, 586 (2d Cir. 1994), this "rule is prudential, not jurisdictional, [and] we have discretion to consider waived arguments," *Sniado v. Bank Austria AG*, 378 F.3d 210, 213 (2d Cir. 2004) (per curiam). "We have exercised this discretion . . . where the argument presents a question of law and there is no need for additional fact-finding." *Id.* "The matter of whether a right was clearly established at the pertinent time is a question of law." *Kerman v. City of New York*, 374 F.3d 93, 108 (2d Cir. 2004). In this case, we asked the Attorney General at oral argument to discuss qualified immunity in response to Dean's argument that the Eleventh Amendment did not bar her damages claim because the Attorney General had been sued in his personal capacity.

resolving all qualified immunity claims. *Id*. at 817. The Court noted a variety of situations in which a two-step rule was inappropriate, including where:

> (1) "[I]t is plain that a constitutional right is not clearly established but far from obvious whether in fact there is such a right."
>
> (2) A "constitutional question is so fact-bound that the decision provides little guidance for future cases."
>
> (3) "[I]t appears that the question will soon be decided by a higher court."
>
> (4) The constitutional decision rests "on an uncertain interpretation of state law."
>
> (5) The "answer to whether there was a violation may depend on a kaleidoscope of facts not yet fully developed."
>
> (6) The "briefing of constitutional questions is woefully inadequate."
>
> (7) A decision "may make it hard for affected parties to obtain appellate review of constitutional decisions."
>
> (8) Where the "sequence in which judges reach their conclusions in their own internal thought processes" is different from the two-step sequence prescribed by *Saucier*, thereby creating a "risk that a court may not devote as much care as it would in other circumstances to the decision of the constitutional issue."

*Id*. at 818–20 (internal quotation marks and brackets omitted). Based on these concerns, the Court held that "courts should have the discretion to decide whether th[e *Saucier*] procedure is worthwhile in particular cases." *Id*. at 821.

We exercise our discretion here and will initially evaluate whether the constitutional right asserted by Dean was clearly established during the relevant period. Only if the right was clearly established will we then consider whether the facts that Dean has alleged make out a violation of a constitutional right. We invert the once-mandatory *Saucier* sequence because, as discussed below, it is clear that a constitutional right to receive campaign contributions was not clearly established, but it is "far from obvious whether in fact there is such a right." *Id*. at 818. We also

11

do not believe that a challenge to a practice that has been defunct for over six years, where injunctive relief is moot and where damages are speculative, presents an appropriate opportunity to explore the complexities of a difficult constitutional question.

In turning to our analysis of whether the constitutional right at issue here was clearly established, we may consider:

> (1) whether the right in question was defined with "reasonable specificity"; (2) whether the decisional law of the Supreme Court and the applicable circuit court support the existence of the right in question; and (3) whether under preexisting law a reasonable defendant official would have understood that his or her acts were unlawful.

*Jermosen v. Smith*, 945 F.2d 547, 550 (2d Cir. 1991).

In attempting to demonstrate a right under the First Amendment to enjoy, in her words, "a meaningful opportunity to raise funds sufficient to mount an effective campaign," Dean argues principally by analogy to other First Amendment rights. First, Dean contends that the receipt of campaign contributions is like the right to receive speech or information, which is protected by the First Amendment. *See, e.g.*, *Kleindienst v. Mandel*, 408 U.S. 753, 762 (1972) ("It is now well established that the Constitution protects the right to receive information and ideas." (internal quotation marks omitted)); *Application of Dow Jones & Co.*, 842 F.2d 603, 607 (2d Cir. 1988) ("[T]he First Amendment unwaveringly protects the right to receive information and ideas."). Second, she asserts that the right to receive campaign contributions necessarily follows from the "reciprocal" rights to make campaign contributions and expenditures, which enjoy protection under the First Amendment. *See Buckley v. Valeo*, 424 U.S. 1, 23 (1976) ("[C]ontribution and expenditure limitations both implicate fundamental First Amendment

12

interests.").[7]

We do not believe that a reasonable person would have known of a firmly established First Amendment right to receive campaign contributions when the challenged policy was in effect. Indeed, Dean has failed to cite any decision available during the relevant time period in which either this Court or the Supreme Court specifically held that a candidate has a First Amendment right to receive campaign contributions. *See In re County of Erie*, 546 F.3d 222, 229 (2d Cir. 2008) ("The question of whether a right is 'clearly established' is determined by reference to the case law extant at the time of the violation."). Instead, she relies heavily upon *Randall v. Sorrell*, 548 U.S. 230 (2006), in which the Supreme Court struck down a Vermont statute's limitations on campaign contributions and expenditures. Because this case was decided several years after Dean's complaint was filed and after Blumenthal had discontinued the challenged practice, any rule articulated by *Randall* could not have been clearly established during the relevant period.

We emphasize that, although we do not consider the right to receive campaign contributions to have been well-established during the relevant time period, we do not agree with the district court's conclusion that such a right is "inconsistent with the structure of the [Supreme Court's] opinion in *Randall*." To the contrary, although *Randall* did not recognize a First Amendment right to receive campaign contributions, its analysis did not foreclose such recognition. *See, e.g.*, *id.* at 248 ("[W]e must determine whether [the Vermont statute's]

---

[7] The act of contribution, which relates to both expressive and associational rights, involves protected speech because "[m]aking a contribution, like joining a political party, serves to affiliate a person with a candidate. In addition, it enables like-minded persons to pool their resources in furtherance of common political goals." *Buckley*, 424 U.S. at 22; *see also Fed. Election Comm'n v. Colo. Republican Fed. Campaign Comm.*, 533 U.S. 431, 440 (2001) ("Spending for political ends and contributing to political candidates both fall within the First Amendment's protection of speech and political association.").

13

contribution limits prevent candidates from amassing the resources necessary for effective campaign advocacy." (internal quotation marks and brackets omitted)); *id.* at 248–49 ("[C]ontribution limits that are too low can also harm the electoral process by preventing challengers from mounting effective campaigns against incumbent officeholders, thereby reducing democratic accountability."). The district court in this case placed great weight upon the fact that the Supreme Court in *Randall* considered as one among several factors—but did not view as dispositive—that the contested statute's "contribution limits will significantly restrict the amount of funding available for challengers to run competitive campaigns."[8] *Id*. at 253. The district court reasoned that if there were a right to receive contributions, then the Supreme Court would have recognized a First Amendment violation in *Randall* after concluding that the contribution limits significantly restricted the funding for challengers' campaigns.

We take issue with the district court's reasoning in two respects. First, the record in *Randall* merely "suggest[ed]" but did "not conclusively prove" that Vermont's statute significantly restricted a contender's funding. *Id*. In light of the record's inconclusiveness, a consideration of additional factors may have been necessary. Second, even if the Supreme Court recognized a First Amendment right to receive campaign contributions, that right need not be absolute and other considerations might be relevant. *See Buckley*, 424 U.S. at 25 ("[I]t is clear that neither the right to associate nor the right to participate in political activities is absolute. . . .

---

[8] In concluding that the campaign contribution limits were too restrictive, the Supreme Court also considered: (1) the statute's "insistence that political parties abide by *exactly* the same low contribution limits that apply to other contributors," which it concluded "threatens harm to . . . the right to associate in a political party"; (2) the requirement that volunteer expenses be included in calculating contribution limits; (3) the fact that the statute's limits were not adjusted for inflation, but declined in real value each year; and (4) the fact that nowhere in the record was there any special justification for the statute's low and restrictive contribution limits. *Randall*, 548 U.S. at 256–62.

14

Even a significant interference with protected rights of political association may be sustained if the State demonstrates a sufficiently important interest and employs means closely drawn to avoid unnecessary abridgment of associational freedoms." (citations, internal quotation marks, and parentheses omitted)).

In sum, Blumenthal is entitled to qualified immunity from Dean's claims for damages because a right to receive campaign contributions was not clearly established when the Attorney General's challenged practice was in effect.[9]

## CONCLUSION

For the foregoing reasons, the judgment of the district court dismissing the complaint is AFFIRMED.

---

[9] Dean also seeks attorney's fees, presumably pursuant to 42 U.S.C. § 1988. It is true that "mootness is not determinative as to the propriety of an award of attorney's fees," which, instead, turns on whether plaintiff is a "prevailing party." *LaRouche v. Kezer*, 20 F.3d 68, 75 (2d Cir. 1994) (internal quotation marks omitted). But, given that we are affirming the district court's dismissal of Dean's complaint and that there has been no "material alteration of the legal relationship of the parties," Dean is clearly not a prevailing party and therefore is not entitled to attorney's fees. *See Buckhannon Bd. & Care Home, Inc. v. W. Va. Dep't of Health and Human Res.*, 532 U.S. 598, 604–05 (2001) (rejecting argument that party may be considered "prevailing" where defendant's change in conduct is voluntary (internal quotation marks omitted)).